## WHITFIELD SANFORD ET 'AL. V. LOUIS MODINE.

### FILED JUNE 3, 1897.   No. 7312.

1. **Sufficiency of Bill of Exceptions.** A bill of exceptions is sufficient
if it contains all of the record of the proceedings to be reviewed
necessary to explain the exception taken. (*Dietrichs v. Lincoln &
N. R. Co.*, 12 Neb., 225.)

2. **Contracts: CROPS: MALICIOUS PROSECUTION: EVIDENCE.** The con-
tract set forth in the opinion construed to place in the owner of
certain land the title and ownership of the crops grown on the
land which, by virtue of the contract, parties therein named ac-
quired the right to plant and cultivate.

ERROR from the district court of Saunders county.
Tried below before BATES, J.   *Reversed.*

*Clark & Allen*, for plaintiffs in error.

*Simpson & Sornborger*, *contra.*

HARRISON, J.

The defendant in error instituted this action against
plaintiffs in error to recover damages for an alleged
malicious prosecution.   As the result of a trial of the
issues joined he obtained a verdict and judgment in the
sum of $50.   The case has been removed to this court by
error proceedings.

The plaintiffs in error desired a review in this court of
the action of the trial court in giving a paragraph of the
charge to the jury, by which a contract in evidence was
construed, and in preparing a bill of exceptions included
therein the portions of the evidence in relation to said
contract and no more.   In settling the bill of exceptions
the trial judge certified "That this, the defendant's bill
of exceptions, contains all of the testimony adduced or
offered by plaintiff and defendants on the hearing of
said cause, touching the contract between the defend-
ant Sanford and the plaintiff and the other Modines, all
of the objections to its admission as evidence, all of the

rulings of the court on such objections, and all of the exceptions to such rulings taken and made at the time." Counsel for defendants in error objected to the allowance of the bill of exceptions on the ground that it did not contain all the evidence, and on other grounds which we need not specifically state. In section 309 of the Code of Civil Procedure it is provided that "No particular form of exception is required. The exception must be stated, with so much of the evidence as is necessary to explain it and no more, and the whole as briefly as possible;" and in section 311, which is in reference to the preparation and allowance of the bill of exceptions, it is prescribed that the draft of the bill "must contain all the exceptions taken upon which the party relies." The bill in the present case contained all the evidence which was necessary to explain the exception taken or to make clear the point which was to be presented. This was sufficient to fulfill the requirements of the Code; hence no further or more extended bill was essential. (*Dietrich v. Lincoln & N. W. R. Co.*, 12 Neb., 230.)

In the argument in the brief filed for plaintiff in error some complaint is made of paragraph No. 14 of the instructions. There was no assignment of any error to the giving of this; hence whether it was error to give it cannot be considered.

The paragraph of the instructions which is the main subject of the discussion in the brief filed is one numbered 6, given by the court on its own motion, in the following language: "That by the terms of the contract signed by Whitfield Sanford, N. P. Modine, and plaintiff introduced in this case in evidence, that the relation of landlord and tenant was created thereby for the year 1890, and that said Whitfield Sanford, by the provisions, terms, and conditions of such lease or agreement, had a lien upon all the crops grown upon the said leased premises for his rent, or to secure the payment thereof. That a sale of the property or crops raised thereon for the year 1890 by the Modines would not be a crime under our

statutes, but would subject the Modines to a civil liability only." The contract between the parties was as follows:

"This agreement made this 8th day of February, 1889, betwen Whitfield Sanford, party of the first part, and C. E. Modine, John Modine, and L. E. Modine, parties of the second part, witnesseth: That the party of the first part does agree hereby with the parties of the second part that they shall have full permission to till and cultivate the following described land, to-wit: the southeast quarter of section ten (10), and all the plowed land on the northeast quarter of section ten (10), in township thirteen (13), range five (5), E., in Saunders county, in the state of Nebraska, except such portion of the prairie as the party of the first part may desire to break, so far as the same may be done in a husbandlike manner upon their performing the conditions of this agreement on their part to be performed. That the said parties of the second part covenant and agree to and with the party of the first part, that they will till, and in all respects cultivate the land above described, during the cropping season of the year 1889 in a husbandlike manner and according to the course of good and correct husbandry; that they will not commit any waste or damage, or suffer any to be done; that they will keep the fences and buildings situate on the said land in good repair, reasonable wear thereof and damages by the elements excepted; that they will do, or cause to be done, all the necessary work and labor in and about the cultivation of said land; that they shall provide or furnish all the seed or seeds necessary to be sown or planted on said land; that they shall furnish all the implements, teams, wagons, farming tools, machinery and appliances requisite to the performance of their part of this contract; that they will do all the work necessary to be done in proper season on or about the said land in order to properly care for and preserve the timber, trees, shrubs, and bushes thereon in a good and husbandlike manner. Said party of the second part agrees to carry and transport all the pro-

ceeds and crops produced on the said land of every name, kind, and description to such place as the party of the first part shall direct in the village of Valparaiso until the party of the first part shall have received thereupon one hundred and seventy-five (175) dollars. Said party of the first part, in consideration of the party of the second part doing all the work and performing all the covenants and agreements on their part to be done and performed by the terms of this contract and the payment by the party of the second part to him of the sum of one hundred and seventy-five (175) dollars by raising and delivering said crops as aforesaid or otherwise by January 1, 1890, agrees to bargain, sell, grant, and convey unto the parties of the second part, their heirs and assigns, all that remains of the proceeds and crops produced on the said land of every name, kind, and description; and said party of the first part agrees that the payment of the sum of money at the time it becomes due as aforesaid shall act as such performance of condition that this contract shall then operate as a bill of sale of said crops and proceeds, provided that the said parties of the second part shall have performed the other conditions of this contract by them to be performed; but in no case shall the said parties of the second part have any interest in or ownership of any part of said crops and proceeds prior to the time full payment of the money agreed by them to be paid shall have been fully paid as agreed upon. Said party of the first part agrees that said parties of the second part may occupy the buildings situate on said land during the cropping season of the year 1889, and if they perform the agreements herein on their part to be performed then the said second parties shall have the use and occupancy of said buildings until March 1st, 1890.

"In witness whereof, the parties hereto have set their hands on this 8th day of February, 1889. The meaning and intent of the foregoing contract is that the party of the first part shall hold all of said crops until he realizes

one hundred and seventy-five (175) dollars from the same, and that thereupon he shall turn over the balance thereof to the parties of the second part as soon as, and upon condition that, they shall have fully performed their part of this agreement. The parties of the second part further agree to dig a well twelve feet deep on said land and curb the same upon condition that the party of the first part shall furnish lumber for curbing it and without further charge therefor. Settled for 1889 and for breaking done that year and the within named parties of the second part do hereby agree to work, cultivate and manage all of the two within named quarter sections of land for one year from and after March 1st, 1890, upon the same terms as stipulated in the within cropper's contract, except that they shall make all improvements they may need and all repairs at their own expense and deliver for the use of said Sanford as therein specified crops and proceeds of said land to the amount of two hundred and thirty dollars. ($230), instead of one hundred and seventy-five dollars as per within contract. Dated this the 15th day of March, 1890."

As we read and understand the foregoing, call it a lease or a contract as you may please, or the parties to it landlord and tenants, or the latter croppers, the agreement was that the parties who worked the land, who planted, cultivated, and harvested the crops had no interest or ownership therein until such time as there had been the division of them contemplated by the express terms of the instrument. This was their agreement directly and plainly stated. There is no claim that it was for any reason as to this stipulation void or not enforceable, and as we know of none, we must accept the contract which the parties made for themselves. We cannot, by so-called construction, supplant it by a different one which would be a contract, not of the parties, but the workmanship of the court. The owner of the land was, by the agreement, the owner of the crops until the performance of the conditions required of the other

parties by the express terms of the agreement. In *Yates v. Kinney*, 19 Neb., 275, wherein the respective rights of the parties to a somewhat similar instrument were under consideration, the statement in the contract therein set forth in respect to the ownership of the crop being that the crop is considered the property of the first party, the owner of the land, until it is divided. Yates was the owner of the land, Kinney the lessee, and Carey one to whom Kinney had mortgaged the crops. The action was by Yates to enjoin the tenant and mortgagee from committing waste, and appropriating the crops to their own use. It was said in the opinion: "The question presented by the fourth assignment of error has been virtually decided by this court in *Dworak v. Graves*, 16 Neb., 706, in which it was held that a tenant might assign his lease or sell his share of the crop raised upon the leased premises without the consent of the lessor, unless prohibited by the terms of the lease, and that such assignment or sale would carry to the assignee or purchaser the rights of the lessee under the contract or lease. It would logically follow that the same rights or interests might be mortgaged. But it is insisted that, as by the terms of the lease the crop is considered the property of plaintiff until it is divided, a different rule would have to be applied, and that no such transfer or mortgage could be made which would not violate the property rights of plaintiff. It is evident that Kinney had some interest in the crops. The fact that the extent of that interest depended upon his compliance with the terms of his lease would not deprive him of the right to sell or mortgage it. By the terms of the mortgage, if by no other means of knowledge, Carey had notice that Kinney's interest was an undivided one and he was charged with notice of the rights of plaintiff. He could take no higher or greater title than Kinney had, and could assert no right as against plaintiff that Kinney had not." It seems clear from the foregoing authority and good logic and reason that whatever right or interest, if such it might be called,

was possessed by the defendant in error and parties jointly interested with him in the crops by virtue of the contract hereinbefore set out, it was what may be termed incomplete and not such as authorized them to retain possession, to sell or dispose of the crops, or to deal with them in any manner which would disturb or infringe upon the complete ownership and control of the plaintiff in error. It was no more than the right to call on him to deliver to them a certain portion of the crops when they had completed the performance of their agreements as contained in the contract.

In the case of the *Consolidated Land & Irrigation Co. v. Hawley*, reported in 63 N. W. Rep. [S. Dak.], 904, a contract in its terms and conditions very similar to the one in the case at bar was in question, the action being one in which the company had made a written agreement with one Bucholtz by which he was to work or till a farm owned by the company during the farming seasons of 1891 and 1892, and it was provided in the contract what share each party should finally have of the crops, but that they should "be and belong absolutely to the company until the division provided for in the contract should be made." It was stated, "This leaves only the question of the ownership of the grain, and this must be determined upon the legal effect of the written contract, there being no conflict as to the facts. Ordinarily the relations of these parties to each other would make them joint owners of the crop raised, but it was competent for them, by prior agreement, to determine what their relations to each other and the crops should be. There were no affirmative undertakings on the part of the appellant, but there were a number on the part of Bucholtz, of great advantage to appellant; and, presumably to secure the full discharge of these, it was agreed that 'the ownership, title, and possession of the crops * * * and the grain realized from the threshing shall be and belong to the party of the first part, absolutely, until a division thereof, as aforesaid, and until the said party of the first

part shall deliver to, and turn over to, the said party of the second part, on said farm, the three-fourths thereof.' These were proper subjects for agreement between the parties, and there can be no doubt as to their intention. Their legal effect, as declared in many cases, was to leave the legal title and control of the crops in the lessor until the lessee's covenants to him were fulfilled, or the crops divided. By their express stipulation they agreed between themselves that they should not be joint owners of the crops, but that the lessor should hold and own them until a division was made; and there is no pretense that such division had been or ever was made, or that appellant had turned over to Bucholtz any part of such crops. As already intimated, it is not important to name this instrument a 'lease,' or simply a 'contract,' or these parties 'landlord and tenant' or 'owner and cropper.' If there were no stipulations in the instrument by which their respective rights were fixed, then the law would have to determine the same, and, as a means thereto, would define their relations to each other; but the parties themselves have done this by an agreement so unequivocal in its intent and meaning that it must control, unless it was such an agreement as the parties, under the circumstances, were not allowed to make. No reason is suggested in argument, and none occurs to us, which would forbid such stipulation. Contracts or leases very similar in terms to this have often been construed as above indicated. (See *Esdon v. Colburn*, 28 Vt., 632; *Wentworth v. Miller*, 53 Cal., 9; *Lloyd v. Powers*, 4 Dak., 62; *Moulton v. Robinson*, 27 N. H., 550; 4 Am. & Eng. Ency. Law, p. 895, note.)" (See, also, *McClelland v. Scroggin*, 35 Neb., 536.)

It follows that there might have been a disposition of the crops by the defendants in error which, as to the rights of the owner, might, according to its intent, have been criminal in its nature. The construction given to the contract by the trial judge in paragraph 6 of his charge to the jury, and the conclusion therein drawn and stated,

was erroneous; its effect might have been to cause the jury to conclude that inasmuch as there could be no criminal liability, in the commencement of any action of a criminal character, the plaintiff in error must have been actuated by malice; hence it was calculated to prejudice the rights of plaintiff in error. The judgment of the district court must be reversed and the cause remanded.

REVERSED AND REMANDED.